# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

### [Filed Electronically]

| | | |
|---|---|---|
| JACOB HEALEY, et al., | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | Case 3:17-CV-71-RGJ-RSE |
| | ) | |
| LOUISVILLE METRO GOVERNMENT, | ) | |
| et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MOTION FOR CLASS CERTIFICATION

*"The rights of every man are diminished when the rights of one man are threatened."*
*John F. Kennedy*

Plaintiff-Movants Jacob Healey, James Michael Jarvis, Jr., Cynthia Dawn Yates, and Betty Melloan (hereafter, "Movants" or "Plaintiffs")[1] respectfully request that the Court certify a class action in this important case, and in support of such motion, respectfully state as follows:

## I.   Introduction.

### A.   Statement of the Case.

Plaintiffs' Third Amended Class Action Complaint in this case [DN 37] describes what Judge Hale considered "a *troubling practice* in which Defendants have systematically failed to comply with state court orders pertaining to individuals' release dates ...." (Emphasis added)  [DN

---

[1] Movants do not include all of the named Plaintiffs in this Motion.  The claims of Plaintiffs, Larry Louis Hibbs, Jr. and Allen Goodfleisch relate solely to Defendants' failure to effect their release for work or home incarceration.  An individual has no constitutional right to be assigned to either work releases or home incarceration.  *Ortega v. U.S. Immigration and Customs Enforcement*, 737 F.3d 435, 439–40 (6th Cir. 2013); *Canterino v. Wilson*, 869 F.2d 948, 954 (6th Cir. 1989).  Discovery has also shown that the determination of eligibility for work release and home incarceration is too complex, fact-intensive, and individualized for class certification and resolution.

17], *Memorandum Opinion and Order*, at p. 2.  The Court subsequently set a deadline for discovery on class certification issues of April 1, 2019, and a deadline for the filing of this Motion of May 1, 2019.  [DNs 40 and 45, *Orders*] As will be shown throughout herein, the discovery taken in this case to-date by the Movants has laid bare the true magnitude of Defendants' unabated and systemic practice of unconstitutionally overdetaining individuals long past a reasonable release time period.

What is worse, is that the Defendants have no idea of the *identities* of individuals that they have overdetained, or *how many* persons they have overdetained. This is despite the fact that they have expressly known of the problems that have caused such overdetentions for *years*. In spite of such knowledge, the Defendants have been deliberately indifferent and have never taken any real steps to put an end to the same.

There is no disputing the importance, or the fundamental constitutional dimension, of the claims raised by Movants in this case.  It has long been recognized that public officials have a duty not only to protect a prisoner, but to "effect his timely release." *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1969).  In *Shorts v. Bartholomew*, 255 Fed. Appx. 46 (6th Cir. Oct. 17, 2007), the Sixth Circuit cited to *Whirl* in support of its recognition that a cognizable constitution claim exists for an "overdetention," because "an incarcerated inmate has 'a liberty interest in being released at the end of imprisonment.'" *Id.*, at 51 (quoting *Schultz v. Egan*, 103 Fed. Appx. 437, 440 (2nd Cir. 2004)); *see also Davis v. Hall*, 375 F.3d 703, 712–13 (8th Cir. 2004). Overdetention claims implicate the rights, privileges and immunities guaranteed by the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution." *See Thome v. Bevin*, 2017 WL 3671314, at *3 (W.D.Ky. Aug. 25, 2017) (citing *Beil v. Lake Erie Corr. Records Dep't*, Fed. Appx. 363, 368 (6th Cir. 2008)); *Barnes v. District of Columbia,* 793 F.Supp.2d 260, 274-77 (D.C. 2011).

The results of discovery taken thus far by Movants, and described in detail below, show not only that class certification is warranted, but that overdetentions in the Louisville Metro Department of Corrections ("LMDC") will no doubt continue indefinitely absent the intervention of this Court.

Individual Defendants Mark Bolton (the Director of LMDC) and Dwayne Clark (who until very recently was Bolton's second-in-command as LMDC Chief of Staff) have known *since at least 2012* that chronic, readily-identifiable problems in LMDC's Records Department were resulting in overdetentions. The problem has been so pervasive and severe that a Jefferson District Judge, in January 2017, ordered Bolton, Clark, and other LMDC officials to show cause why they should not be held in "Contempt of Court" for the "repeated and patterned failure to comply with [that] Court's Orders of Commitment and Release" with which that Judge was personally aware. *See Judge Burke 1.27.17 Show Cause Order attached hereto as **Exhibit A**.* After the case *sub judice* was filed the following month, the Metro Council of Defendant Louisville Metro Government commissioned two separate audits – one internal, one external – in an attempt to get a handle on the serious problem.

Those audits, and Movants' discovery obtained thus far in this case, show clearly that LMDC's Records Department is woefully understaffed, its employees are paid too little and receive too little training, it has too much turnover, inexperienced employees are "pulled" from other areas to work in areas in which they are no longer familiar and/or up to date on job duties, and its operations are too paper-intensive and disorganized, to avoid *repeated violations* of American citizens' fundamental right to be released from confinement upon expiration of their sentence or pursuant to a lawful court order. However, Defendants have done nothing to correct any of these problems, and remain alarmingly ignorant about just how serious the issue of

overdetentions have become.  Indeed, it does not appear that Bolton or Clark, or anyone else at LMDC, undertook any remotely thorough investigation of releases occurring over any period of time in an effort to determine the true scope and extent of the problem *until Movants did so in this case*.  And Movants' investigation has shown that although LMDC's "goal" is to release incarcerated citizens within four hours of receipt of a court order, anywhere between 25% and 50% of individuals released from LMDC remain incarcerated more than four hours following the order for their release.  Individuals are being overdetained on a daily basis -- *some for days, some for weeks.*.

As the court said in *Barnes v. District of Columbia*, 793 F.Supp.2d 260 (D.C. 2011):

This Court's alarm at the DOC's lack of urgency in responding to this disturbing pattern of overdetentions ... is further enhanced by the fact that this case deals with prisoners, outcasts in society. The full brunt of the harm for the DOC's refusal to get its act together falls, not on District employees or influential citizens, but exclusively upon persons with little voice, who are shut away from public view. It is for these reasons that the Court finds that the DOC's treatment of inmates entitled to release ... is not merely alarming, and deliberately indifferent, but conscience-shocking. *Id.*, at 280.

## B.    The Movants' Claims.

Movants have all been overdetained at LMDC and all have claims which are representative of the proposed class.  As set forth in Plaintiffs' Third Amended Class Action Complaint:

1.    **Plaintiff Jacob Healey** was ordered by the court to serve only three days' imprisonment at LMDC but ended up spending five – he was released only after his repeated inquiries as to why he was still being held [DN 37, Compl. at ¶ 14];

2.    **Plaintiff James Michael Jarvis, Jr.** remained incarcerated for three days after he was ordered released on his own recognizance ("ROR"). *Id.* at ¶ 16;

3.    **Plaintiff Cynthia Dawn Yates** remained incarcerated for six days after her charges were dismissed. *Id.* at ¶ 18; and

4.      **Plaintiff Betty Melloan**, despite being ROR'd at approximately 9:00 a.m. on January 8, 2018 (almost one year *after* this case was filed), was not released until after twelve noon the next day on January 9, 2018, almost 30 hours after the judge ordered her to be released.[2] *Id.* at ¶ 19.

**C.      Movants' Proposed Definition of the Class.**

Movants propose the following definition of the class:

> *All persons who, since February 3, 2016,[3] were imprisoned, detained or incarcerated more than four hours after: (a) entry of an order directing their release; and/or (b) their satisfaction of their term of incarceration set by prior court order.*

This definition of the class satisfies the implicit requirement that the "class must be presently ascertainable based on objective criteria that do not require the [C]ourt to delve into the merits of the claims." 1 McLaughlin on Class Actions, §4:2 (10th ed. 2013); *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) ("[For] a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria."). In *Rikos*, the Sixth Circuit considered the class in that case to be sufficiently ascertainable even though class membership could only be determined with reasonable – not perfect – accuracy through a substantial review of the defendant's records. *Id.*, at 525-26; *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539-40 (6th Cir. 2012). In this case, as referenced above and set forth in more detail below, Movants have demonstrated that the class can be ascertained through a review of Defendants'

---

[2] LMDC will claim that Ms. Melloan "requested" to be kept in jail an extra night, but this is misleading. LMDC did not discover that she was being overdetained until approximately midnight on January 8, 2018, *or 15 hours after she had been ordered to be released*, and thus she asked to be kept overnight on that *next night* because she did not have a ride or a winter coat on a cold January night. According to its own "goal" of releasing persons within four hours of receipt of the court order, Ms. Melloan should have been released by approximately 1:00 p.m. on January 8, 2018.

[3] This is the date one year prior to the filing of Plaintiffs' Original Class Action Complaint. The statute of limitations applicable to an action in Kentucky for violation of 42 U.S.C. §1983 is one year. *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990).

records by performing that very type of review that Movants themselves performed over a four-month sample period.

## II.    Facts.

In *Shorts, supra*, the Sixth Circuit adopted a three-prong test for Fourteenth Amendment claims of overdetention. To succeed on such a claim, Movants must demonstrate: (a) "that a prison official had knowledge of [their] problem and thus of the risk that unwarranted punishment was being, or would be, inflicted"; (b) "that [Defendants] either failed to act or took only ineffectual action under circumstances indicating that [their] response to the problem was a product of deliberate indifference to the prisoner's plight"; and (c) that "a causal connection between [Defendants'] response to the problem and the infliction of the unjustified detention" exists. 255 Fed. Appx. at 55 (quoting *Sample v. Diecks*, 885 F.2d 1099, 1110 (3rd Cir. 1989)).  The facts already adduced in discovery clearly meet this burden.

### A.    The Scope and Seriousness of LMDC's Overdetention Problem.

Early on in this action it became abundantly clear that the Defendants *did not know who* they had overdetained, nor did they ever track the amount of time from the time LMDC received a release order, and the time the person was actually released. Through discovery, Plaintiffs requested the following of Defendants:

> Please identify by name and last known address and telephone number all persons at the Louisville Metro Department of Corrections ("LMDC") from February 3, 2016 to the present who were:
>> a.    Imprisoned, detained, or incarcerated longer than ordered by Courts of the Commonwealth of Kentucky;

Defendants responded by producing two spreadsheets. One purported to be a listing of late releases from the LMDC "mail jail" complex. Said spreadsheet listed *only 29* late releases from LMDC's mail jail for the time period February 3, 2016 through the date of production, August 17, 2018 (two and a half years at that point). The various reasons listed for "causes of delay" are illustrative

of the disorganization and inattentiveness of the LMDC Records department. Some of which include: "Records had lack of staff, was behind in paperwork" (1 day); "Records misplaced the paperwork" (2 days); "Records failed to release" (2 days, 3 days, 4 days); "Records failed to process the release from custody" (3 days, 5 days, 5 days, 26 days); "File folder was misplaced in records" (2 days, 2 days, 2 days, 5 days, 5 days); "Bail credit had not been applied" (1 day, 1 day, 9 days); "Good time credit was not applied to sentence" (1 day, 5 days); "Records miscalculated sentence credit" (10 days, 10 days); "Records incorrectly calculated sentence" (12 days); "Unknown records error" (15 days);, and, "Charges were amended down, but were not changed in records" (142 days).

The second spreadsheet Defendants produced purported to list late releases from LMDC's Home Incarceration Program ("HIP") for the same relevant time period. Said spreadsheet listed *only 14* late releases from HIP for the same time period. Some of the exact same "causes of delay" were listed such as "good time credit not applied to sentence" (32 days, 4 days, 4 days, 4 days), but also listed a few others such as "Records did not place in computer nor the time out book" (22 days) and "HIP never received release from records" (13 days, 13 days). *Copies of the main jail and HIP late release spreadsheets the Defendants produced are attached hereto as **Exhibit B and C** respectively.*

Upon receipt of the above discovery responses it was immediately apparent that Defendants were completely unaware, whether by design or not, of scores of other persons whom they had overdetained. This was glaringly apparent because the spreadsheets did not even list the named Plaintiffs in this action. As such, Plaintiffs thereafter tendered the following follow-up discovery request to Defendants:

> Please produce a document which lists the following in excel spreadsheet format (as the format you have previously produced to Plaintiffs): The name and address of <u>all persons</u>

<u>who were released</u> from Louisville Metro Department of Corrections ("LMDC") for the time period between <u>February 3, 2016 to the present</u> in the following format, in chronological order:

| Name | Address | Date **and time** a court ordered inmate to be released from LMDC (time court *sent* release order to LMDC)[4] | Date **and time** LMDC released inmate to leave the jail |
|------|---------|----------------------------------------------------------------------------------------------------------------|----------------------------------------------------------|
| John Doe | 123 Main St, Louisville, Ky 40202 | 2/3/16 – 9:35 a.m. | 2/3/16 – 1:35 p.m. |

Defendants' response to the above request stated as follows:

**RESPONSE:** Objection. This response is overly broad and unduly burdensome. The Defendants are not required to place this information in a spreadsheet as part of the discovery request and reject that request. The Defendants attempt to comply with discovery discovered that a report for just one month generated a 304 page report with 2,949 releases. Plaintiffs are requesting information compiled from each release for a period of about 30 months. 30 months times 3000 releases each month = 90,000 files. LMDC personnel spent 20 minutes pulling the information for 2 pages of the 304 pages. It would take approximately 55 hours to complete just 304 pages. It is estimated that the time it would take to review 30 months' worth of releases; 30 months x 304 pages/month x 55 hours = over 500 thousand hours.

Upon receipt of Defendants' response above claiming that it would take them over 500,000 hours (or 42.8 years) to identify all persons' release times that they had "released" from February 3, 2016 to the present, Plaintiffs thereafter requested to view for themselves LMDC's inmate release records for two different time periods. First, a review was conducted of inmate releases for the time period <u>February 3, 2016 through March 31, 2016</u>. Said two-month sample time period was selected because it represented a two-month time period one year before this action was filed. Said sample review encompassed **3990** inmate files and was conducted by Plaintiffs' counsel's staff. The review took 19 days and was conducted in November and December 2018 at LMDC's

---

[4] We request the date and time the court sent the release order, not the time LMDC actually opened the email, or other method by which LMDC began processing said order. LMDC has given testimony that most release orders are sent by email and therefore it can track when the orders were sent by the court. (Footnote in original discovery request).

archives location in Portland in a dimly lit warehouse that required bringing portable heaters to stay warm because of the lack of heat in said archives area. *See Affidavit of Jennifer Moss attached hereto as **Exhibit D.**.* **The results of the Plaintiffs' 2016 two-month review were nothing short of astounding**. This is especially so when compared to Defendants' discovery responses discussed above wherein they disclosed only <u>43</u> overdetained individuals for *a two and half year time period* that was also encompassed within Plaintiffs' review of 3990 files within said *same time period*.[5] Plaintiffs discovered 11 inmates overdetained one day or more just within said two-month period, including 1, 10, 12, 19, 20 and 24 day overdetentions. Plaintiffs also noted the release times between 4 and 24 hours, which totaled just over 1100 for the sample. *See LMDC Release time Audit 2-3-16 through 3-31-16 attached hereto as **Exhibit E***. It begs the question as to how and why did LMDC only identify <u>two</u> overdetentions in all of 2016, yet Plaintiffs found <u>11</u> in just two months of the same time period.

<u>**LMDC Release times got worse after this action was filed.**</u>

The second LMDC sample release audit conducted by Plaintiffs was for the time period June 1, 2017 through July 31, 2017. Said two-month time period was selected for the sample because it represented inmate release times roughly six months *after* this action was filed in February 2017. **4447** inmate files were reviewed for said sample and took 18 days to conduct. One would have envisioned that the results of release times six months *after this action* was filed would have shown improvement. Remarkably, they did not. The release times which exceeded one day or more in the two-month 2017 sample increased from <u>11</u> in 2016 to <u>16</u> in 2017. The release times between 4 and 24 hours, which totaled just over 1100 for the 2016 sample swelled to well over

---

[55] Unbelievably, Defendants' discovery response only indicates **two** main jail overdetentions and **zero** HIP overdetentions in all of 2016. This simply is not credible when compared against the results of the actual review of thousands inmate files such as done by Plaintiffs in this action.

2000 for the 2017 sample of persons released well after this action was filed. *See LMDC Release time Audit 6-1-17 through 7-31-17 attached hereto as **Exhibit F***.

In total, Plaintiffs reviewed **8437** inmate files which took almost seven and a half work weeks to perform. From the two sample sets, certain extrapolations of the data gathered makes it clear that Defendants have been overdetaining inmates at alarmingly high rates, yet have done virtually nothing to correct it, and it has gotten worse and will continue on the same trajectory without this Court's intervention. From the 2016 sample, it can be extrapolated that 198 inmates were overdetained one day or more from February 3, 2016 to the present, with 432 persons overdetained between 12 and 24 hours, and 19,278 over LMDC's four hour "goal." *See LMDC Release Time Audit Results Extrapolations hereto as **Exhibit G***.

From the 2017 sample, it can be extrapolated that 288 inmates were overdetained one day or more from February 3, 2016 to the present, with **2862** persons overdetained between 12 and 24 hours, and 35,910 over LMDC's four hour "goal." Even when averaging the data from the two sample sets and extrapolating the same over the relevant time period, one day or more overdetentions for the time period total 243 persons, late releases between 12 and 24 hours total 3294 persons, and there are a total of 55,188 late releases over LMDC's four hour "goal." The actual numbers are conscious-shocking and have been completely avoidable for years as discussed below.

### B.    Why Is LMDC Overdetaining American Citizens?

The reasons giving rise to LMDC's persistent and pervasive overdetention of inmates have been known about by Defendants for many years, at least going back to 2012, even if they continue to deny that they overdetained the numbers of persons Plaintiffs have discovered. The reasons include, but are not limited to: understaffing; undertraining; overworking; ineffective

communications systems; ineffective leadership and management, bad relations between union and management, destruction of relevant court documents in recent instances; and, a general deliberate disregard and indifference to the problem of overdetaining persons.

In 2012, an Operational Audit of LMDC was performed to help LMDC get prepared to be accredited by the American Correctional Association ("ACA"). The "Charge to the audit team" in 2012 was to evaluate "the organizational effectiveness of LMDC and identifying opportunities for improvement." *See P. 2 of excerpts of June 15, 2012 Operational Audit of Louisville Metro Department of Corrections attached hereto as **Exhibit H**.* As part of said audit, a survey was conducted of "criminal justice and Metro partners to assess external perceptions related to customer satisfaction and overall agency performance." *Id.* at p. 5. Approximately 37% of the **2012** survey respondents provided suggestions which included "improve release processing time" and "incorporate additional information into Weekly Population Reports, i.e. number of probation/parole violators, *average time from order of release to actual release,* and trend information.(Emphasis added) *Id.* at p. 5. Yet, despite the knowledge of problems with releasing persons on time dating at least back to 2012, no real concrete steps have been taken to address the problem, and none of the information suggested to be placed into the Weekly Population Reports was ever done.

Soon after Judge Burke's January 2017 Show Cause Order and after this lawsuit was filed in February 2017, Louisville Metro Councilman David James requested that the Metro Office of Internal Audit perform a "review of the Department of Corrections' inmate and release and in custody classification movement activity." The Metro Internal Audit was performed and the results were published in January 2018. *See Louisville Metro Department of Corrections Inmate Release and In Custody Classification Movement Activity January 2018 Audit p. 2, attached hereto as*

*Exhibit I*.[6] The 21 page audit summarized the results of "opportunities to strengthen the internal control structure of LMDC, as including, but not limited to: "Non-Compatible Systems" between the courts and LMDC; "Court Order Clarity" between the courts and LMDC; "Time Frame Expectations" to be given more clarity between the courts and LMDC; "Monitoring and Tracking Court Orders" to maintain a "queue of court orders in process"; "Court Order Repositories" to maintain all sentencing directives in one place versus two; and "Sentence Calculation" needed to be addressed because they are currently manually calculated. *Id.* at pp. 3-4.

Every single one of the issues identified by the 2017 internal audit have been known about for *years and years* by LMDC and have contributed to overdetentions as will be discussed in deposition testimony in Section C below. However, it took Judge Burke's Show Cause Order and this lawsuit to finally get LMDC's attention on these serious matters that have been consistently contributing to persons' unreasonably late release times for years. Notably, LMDC concurred with all recommendations in the internal audit for their "corrective actions plans." *Id. passim.*

Recently, an external independent audit of LMDC's operations was also completed by a company named CGL Companies ("CGL"). *See Louisville Jefferson County Metro Government Department of Corrections Judicial Directives Audit dated February 4, 2019 attached hereto as Exhibit J.* In the "Background/Objectives" introductory audit comments, CGL stated:

> The Louisville Jefferson County Metro Government contracted with CGL Companies to conduct a comprehensive audit of the judicial directive (court order) system in the county. The system had experienced issues with the timely implementation of court orders, as well as their clarity and consistency. CGL was charged specifically with developing a database of court orders that could be analyzed to answer the following questions:

> - Is there a standardized method for communicating court orders?
> - Are court orders processed quickly and accurately?
> - Do a significant number of court orders lack clarity and require extra clarification?

---

[6] It should be noted that the 2018 Metro Internal Audit pointed out that "determining the quantity of inmate releases and in custody classification movements that were not in accordance with the associated court order was not an objective of the review." *Id.*

- Does the system have errors that negatively impact individuals in the criminal justice system?
- Are there specific issues in the court order system that, if corrected, would improve system efficiency? *Id.* at p. 3.

Ironically, CGL's audit got off to a poor start due to LMDC's inefficiencies. It was noted that CGL was to receive a sampling of 200 court orders per month for each of the 14 months of the study. *Id.* at p. 4. However, CGL discovered immediately that the requested court orders were not pulled by LMDC according to the sampling methodology that had been contracted for. It was too "labor intensive" for LMDC and it was thereafter agreed that a random sampling of 50 files for each of the 14 months for a total of **700** court orders would be pulled for the sample.[7] *Id.*

CGL also immediately discovered that critical information was missing in the 700 files it *actually received*, such as: date/time of court order initiation; judge's name; clerk's name; method of transmittal to LMDC; receipt time of orders by LMDC; name of LMDC staff who reviewed the order; when the order was implemented; and, when the order was transmitted from the clerk. *Id.* at pp. 4-5. Again, none of these are new issues. They have existed for years, and the fact that LMDC could not even properly gather the data requested illustrates what a mess LMDC's release system has been in for years, and what has led to massive overdetentions over the years.

Interestingly, CGL found 16 release errors in 2016, 4 in 2017, and 17 during 2018. *Id.* at p. 10.  However, it is noteworthy that LMDC only disclosed 2 for *all of 2016* as discussed *supra,* and Plaintiffs' discovered 11 in just two months of 2016. CGL noted that a portion of the errors could be attributed to "obvious mistakes" of LMDC Records Office staff, while others reflected the "complicated nature of interpreting multiple court orders", the audit also noted that "*it was clear from our review that high turnover rates in the LMDC Records Office, resulting in*

---

[7] It should be noted that Plaintiffs' review of **8437** inmate files and release orders arguably provide a more reliable data set than CGL's **700**.

*inexperienced staff, likely contributed to a number of release errors.*" (Emphasis added). *Id.* at pp. 10-11. The CGL audit recommended that the court order system be completely automated, and that the criminal justice information system between the courts, the clerk's office and LMDC be integrated. *Id.* at p. 19, 21. The audit also recognized that all stakeholders in the criminal justice system must be involved to fix the system. *Id.* at p. 24.

Finally, CGL noted that "extremely high" levels of staff turnover in LMDC's Records Office (44% turnover in 2017) and too little training "can create significant issues for LMDC's ability to quickly process and implement court orders." *Id.* Common sense dictates as much and LMDC has been aware of this serious problem for years, yet the turnover problem and inexperienced staff problems continue, which in large part are reasons which have given rise to Plaintiffs' claims herein. The fact that a sitting Judge such as Judge Burke saw such a serious problem with court orders not being followed by LMDC that she actually issued a Show Cause Order against the Director and other leaders of LMDC is telling as to how bad of a problem exists in LMDC not accurately and timely implementing court orders. Such problems have severely affected the lives of people like the Plaintiffs and the class they seek to represent. After the CGL Audit was made public one local media outlet wrote:

> "The system Louisville judges and Metro Corrections employees use to release inmates is outdated, riddled with mistakes and complicated by a revolving door of jail staffers without the necessary experience and training. These are a few of the conclusions a city-commissioned audit found that have caused Metro Corrections inmates to be improperly released from jail, either too early or late – errors that could cost the city in civil lawsuits."

*See WDRB.com March 27, 2019 article "Audit finds 'confusion and complication' in Louisville jail release system" attached hereto as* **Exhibit K**.

### C.    Defendants' Deliberate Indifference.

Defendant, Louisville Metro Government, has known of the problems at LMDC for years. In an October 11, 2018 Louisville Metro Council Meeting, discussion was had concerning the "paper-based" system that LMDC used concerning court orders, and a Resolution was approved supporting Metro Technology's inclusion in the development of a new case management system for use in Kentucky's courts. Councilman Brent Ackerson stated that the system for releasing inmates at LMDC was "chaos", that the "underpaying" of employees in LMDC's Records department was "well-known", and that it is a problem that "didn't come out of nowhere"… "it's a problem that has been ripening for years"… "there's no surprises here" and, "we need to shame someone into doing the right thing."

http://louisville.granicus.com/MediaPlayer.php?view_id=2&clip_id=5763 at 44:38.

### LMDC Records Department Coordinator Arnetta Al-Amin

Arnetta Al-Amin was for all relevant periods herein, and still is, the Coordinator of the Records Department of LMDC. She reported to the LMDC Chief of Staff, Dwayne Clark. Ms. Al-Amin's deposition was taken twice in connection with this action. The first occurred on September 20, 2018.[8] Al-Amin's testimony in the first deposition revealed several important points. As stated, Al-Amin is the Coordinator, or "Supervisor One" in LMDC's Records Department. In said position, she supervises the supervisors who oversee the staff who process inmate releases. *See DN 49, Ex. 1, Al-Amin Sept. 20, 2018 Dep. at 7-9.* Al-Amin stated that there should be seven Senior Corrections Technicians ("SCT")[9] working in Records on first shift, and five each on second and

---

[8] All depositions taken in this action have been filed in their entirety for the Court's convenience as Exhibits in DN 49. As such, Plaintiffs will cite to DN 49 and the Exhibit and page number for deposition citations herein.
[9] SCTs are the LMDC positions whose main functions are to process inmate releases received from the courts, although LMDC "Intake and Release" employees play a role in checking for outstanding warrants, etc.

third shifts. *Id.*at 22. As will be shown herein, such staffing requirements have been rarely met over the last few years.

Remarkably, Al-Amin testified that releases are not prioritized where the oldest ones received are processed first. *Id.* at 38. When asked why not, she claimed "they are just getting them processed" *Id.* She said there is simply no "system" in place to process the releases in the order they are received. *Id.* at 48-49. This obviously explains why a release entered by a court earlier in the day may not get processed until *after* one that was entered later in the day. Thus, another blatant and obvious reason for another possible unreasonably late release. Al-Amin also testified that LMDC's "goal" is to get releases processed in two to four hours, but that it was not a "policy" or "procedure" written down anywhere. *Id.* She testified about proposals going all the way back to 2015 to update LMDC policies to state that email boxes containing releases should be checked every 15 minutes. Al-Amin has even asked her boss, Dwayne Clark why the policies were not updated, but she could not give an answer as to why they were not. *Id.* at 62-63.

Importantly, Al-Amin testified that the Records Department is "short-staffed" on SCTs (the staff who process inmate releases). She raised her eyebrows and smiled when asked if she had ever informed anyone of the problem and stated "yes" and stated that she had done so more than once. *Id.* at 64-65. She acknowledged that it was a "matter of common knowledge." *Id.* Despite "common knowledge" of the staffing problems in LMDC for such critical positions such as those who are supposed to timely and accurately effectuate persons' releases, nothing effectual has been done to alleviate such problem which can obviously directly correlate to late releases.

Al-Amin also testified that no one had ever directed her to implement any of the recommendations of the January 2018 Metro Internal Audit even though LMDC had concurred with the recommendations therein. *Id.* at 115. Al-Amin stated that Director Bolton rarely visited

the Records Department and that the last time he had come to visit was "before Christmas."[10] She also stated that there was no records kept as to the amount of time it took to release inmates. *Id.* at 137. Al-Amin testified that Bolton wanted her to do an "incentive thing" with the staff back in 2012 or 2013 to try to reduce late releases and release errors, but that it never really helped. *Id.* at 155. Such types of "ineffectual action" illustrates why the late release problem has continued unabated for years.

Al-Amin's deposition was taken again in connection with this action on November 19, 2018 because of some important late documents that were produced to Plaintiffs *after* her first deposition, mainly emails. Al-Amin was initially questioned about an October 9, 2017 (nine months *after* this action was filed) email that she sent to all of the LMDC Records employees along, with her supervisors who worked under her and her boss Dwayne Clark copied. *See DN 49, Ex. 2, Al-Amin Nov. 19, 2018 Dep. at 8-9.* The body of the email read in relevant part:

> "I've been advised that we are requesting paperwork updates from the courts that they have already sent. I was informed that certain staff members are shredding or discarding the paperwork that is emailed from the court as "No bodies" and the paperwork is not being processed and/or the case number is being entered in XJail, but the paperwork is discarded and not placed inside the folder. All inmate paperwork coming from the courts is to be reviewed and processed according! [sic] I hope that this is not true. However, if it is please know that your actions will result [sic] severe consequences!"

*See copy of October 9, 2017 email attached hereto as **Exhibit L.*** Al-Amin could give no definitive reason for the email or even what particular staff were allegedly shredding and discarding paperwork/emails from the courts concerning inmates. But such a practice clearly rises above deliberate indifference to approach intentional misconduct. Every piece of paper sent from the courts to LMDC concerning inmates in their custody affects the rights of said inmates, up to and including, their constitutional right to be released on time. If LMDC is shredding or discarding

---

[10] This deposition of Al-Amin was taken in September 2018, so Bolton had not even stopped in to Records as per Al-Amin's knowledge since at least 10 months before. This is despite this lawsuit and various audits being performed.

court paperwork related to them, it is akin to shredding those same constitutional rights. Amazingly, Al-Amin, as the Coordinator of the Records Department, did not even make an effort to find out which persons were allegedly doing the shredding and discarding of court paperwork. *See DN 49, Ex. 2, Al-Amin Nov. 19, 2018 Dep. at 20.*

Al-Amin again confirmed a lot of staff shortages in her department and that many people work overtime, up to 16 hours of work in a day. *Id.* at 38-39, She also seemed to think it was fine if persons were released late if was due to the releasing employee being "in training." *Id.* at 49-50.

### LMDC Records Department First Shift Supervisor Sharonda Simmons

Sharonda Simmons is the first shift supervisor in LMDC's Records Department. *See DN 49, Ex. 6, Simmons Mar. 27, 2019 Dep. at 6-7.* Ms. Simmons has worked at LMDC since 2001 and was promoted to a Records supervisor in 2011. *Id.* Simmons testified that maybe twice per week she had to pull people from other areas to work in Records, and had to totally "do without" a full staff three times per week. *Id.* at 17. She also acknowledged that there is a lot of turnover in the Records Department. *Id.* at 18. Simmons testified that she had never been part of any discussions that had as their focus trying to reduce the number of overdetentions. *Id.* at 26. Simmons also testified that she is mainly made aware of overdetentions through outside sources such as attorneys or family members calling and raising the issue. *Id.* at 32.[11] Simmons also testified that she was not aware that the weekly population reports for the jail were ever updated to include the average time from order of release until actual release as was advised in the 2012 audit discussed *supra. Id.* at 41. Simmons testified that she is not aware of anything being done to develop a method to track and monitor court orders processing times. *Id.* at 49-50.

---

[11] This once again illustrates that LMDC does not have any internal systems in place that should alert the staff for overdetentions.

As to staffing, Simmons testified that first shift is short maybe twice per week, and that second shift is short "every day." *Id.* at 72-73. The same for third shift. *Id.* at 74-75. She also stated that there are periods of time when there is nobody to staff Records on second shift. *Id.* Simmons testified that the training for staff to work in the Records Department was shortened to four weeks a long time ago, but did not know why. *Id.* at 86. But, she acknowledged that the training could be extended if need be. *Id.* at 87. The shortening of training time has gotten shorter, despite the job getting more complicated. *Id.* at 89. And, the union has made formal complaints "for a while" about staffing issues. *Id.* at 113-114.

In fact, AFSCME (the "Union"), the Union which represents the civilian Records staff at LMDC submitted a letter with numerous attachments to Judge Burke concerning staffing and other issues that contributed to inmate release errors. *See AFSCME letter with attachments to Judge Burke dated January 26, 2017 attached hereto as **Exhibit M**.* Said Union letter lays out numerous important issues which have had some part in giving rise to this lawsuit. The letter states that it had made "numerous attempts" to work with LMDC to correct errors in releasing inmates, but the relationship with the administration had been "adversarial" and communication had been "stalled." *Id.* at 1.

The Union stated that it had filed numerous grievances concerning issues of releasing inmates early, late, or not to the proper housing location. *Id.* The Union stated that it had identified, short staffing, pulling staff from other areas, lack of proper training, intimidation, and a general hostile work environment as reasons that exacerbate the inmate release problem. *Id.* The letter goes on to relay that to no avail it has consistently asked LMDC to staff the department with the proper staffing level, and to stop pulling workers from their normal work areas to work in areas where

they may have limited or outdated training. *Id.* at 2. The letter also confirms that "training has been shortened", which is "not conducive to proper staffing skills and reducing errors." *Id.*

The attachments to the Union letter are indicative of the true nature of how the Records Department operates from the eyes of *those who actually work there*. The first grievance attached is signed by 25 members of the Records staff and concerns "pulling" employees to cover "other bidded areas to cover for staff shortages." *Id.* at 4-5. The attachments also indicate a lack of "adequate training" (*Id.* at 8-9), and management not signing grievances acknowledging that they even received them. *Id.* at 53.

**LMDC Records Department Second Shift Supervisor Marylea Nicholas-Bates**

Marylea Nicholas-Bates is the second shift supervisor in LMDC's Records Department. *See DN 49, Ex. 5, Nicholas-Bates Mar. 27, 2019 Dep. at 7.* Ms. Nicholas-Bates has worked in the LMDC Records Department for 19 years. *Id.* at 6. Other than Al-Amin, Nicholas-Bates is the most senior person in Records. *Id.* at 7. She also testified that understaffing on her shift has been a problem for at least five years. *Id.* at 9. Nicholas-Bates also testified, consistent with Simmons *supra,* that she finds out about late releases mainly from outside sources. *Id.* at 38. She testified that no one other than maybe her lawyer had ever spoken to her about this action. *Id.* at 50, 62. She was never actually seen any of the results of the 2018 Metro Internal Audit or what recommendations were contained therein. *Id.* at 50-53.

**LMDC Chief of Staff Dwayne Clark**

Dwayne Clark was the Chief of Staff of LMDC since 2004 and had just retired six weeks before his deposition in this action. *See DN 49, Ex. 4, Clark Dep. April 11, 2019 Dep. at 19-20, 23.*Clark testified that Director Bolton never called a meeting to discuss the allegations of this action after it was filed, and he did not even have a general understanding of this lawsuit in which

he is a named Defendant. *Id.* at 21-22. He, like Al-Amin, testified that persons should be released within four hours of a court order "all things being the same." *Id.* at 26. Clark knew that court orders had been inconsistent for a long time (which necessarily affects LMDC's ability to timely release persons), yet when asked if when he was Chief of Staff if he had done anything to help fix the problem, he shrugged it off by saying "The court orders don't originate from the jail. I don't write the court orders, nor do the staff there write the court orders." *Id.* at 28. He never put together any committees or asked his employees to try to help fix the problems with court orders. *Id.* Clark did nothing about the problem even though he expressly acknowledged that the same "causes problems getting people released." *Id.* at 29.

Clark did not know why there was not a "policy" that he be notified for every overdetainment. *Id.* at 34-35. He agreed that not having proper staffing levels can slow releases down. *Id.* at 39. Incredibly, Clark testified that he believed maybe "ten people a year gets over incarcerated." *Id.* at 64. He again testified that he did not try to fix the court order problem because "it doesn't belong to me." Clark also did not seem to appreciate that LMDC's corrective action plan to address issues discovered in the 2018 Metro Internal Audit included a 24 hour period before following up with a phone call concerning a court order that needed clarity. He did not seem to understand or even care that 24 hours was a long time for the person sitting in jail who was already ordered to be released. *Id.* at 79-82.

As to staff training, Clark testified that the training period for SCT's had been four to six weeks since he began at LMDC, and that the training period had never been reduced. *Id.* at 93. This directly contradicts the union complaints referenced *supra*. Clark also agreed that Records employees had been underpaid, overworked and understaffed for a long time. *Id.* at 98-99. He also acknowledged that the union had complained about staffing problems for "at least" five years. *Id.*

at 101. Clark ended his testimony by acknowledging that the only way he knew of overdetentions was through "incident reports." The evidence in this case, including all of the overdentions found in Plaintiffs' review of 8437 inmate files, clearly establishes that incident reports were not in any of said files. LMDC simply does not know who it has overdetained.

### LMDC Director Mark Bolton

Mark Bolton's is the Director of LMDC and has been since 2008. *See DN 49, Ex. 3, Bolton Dep. April 19, 2019 Dep. at 7.* Bolton's deposition answers were for the most part rambling and lengthy, but several key points were established. He had no sense of how many people are overdetained in his jail on a monthly or yearly basis. *Id.* at 10. (He should). Bolton continually attempted to deny most all LMDC responsibility, by using terms such as "complexities" and "nuances" *ad nauseum* throughout his testimony. He did however finally begrudgingly admit that not being kept in jail after a sentence is served is a "fundamental constitutional right." *Id.* at 12-13. Bolton claimed the only "systemic nuances" under LMDC control concerning releasing individuals on time was human errors in the Records Department. *Id.* at 20. However, he made clear that "serious nuances outside the modus of control of Corrections needed to be put under the microscope." *Id.*

Bolton had been aware for five years plus of the lack of automation problem in Records that hindered CGL's ability to obtain data it need for its audit. *Id.* at 22-23. Although Bolton continued to beat the drum that the courts and the clerks were the "keepers of the records" he had to admit that it was LMDC's responsibility to implement said court orders. *Id.* at 26-28. He admits that he "rarely" visits the Records Department at LMDC. *Id.* at 36.

He testified that the CGL Audit validated what he had "suspected" i.e., court orders weren't always signed or needed clarifying. *Id.* at 43. No real recognition of LMDC's responsibilities. That

was the general theme of Bolton's testimony. He wanted to place the majority of blame on anyone and everyone else in the criminal justice system for reasons that could cause late releases. Bolton never seemed to get that LMDC's job is to release people on time. If court orders weren't clear and were causing delays in his department he should have done something about it years ago. Instead he has had, and still does, have a *laissez faire* attitude about the same. Bolton did have to admit that staff turnover contribute to late releases. *Id.* at 48.

When questioned about Judge Burke's Show Cause Order, Bolton came across as dismissive if not downright contemptuous. He referred to Judge Burke as "Burke" and characterized Show Cause Orders she had entered against him as "weird." *Id.* at 110-114. He "stipulated" that he had meetings with LMDC staff about the allegations of this action, but could not recall any directions, instructions or orders he gave as a consequence of said meetings. *Id.* at 114-115.

### III.   The Requirements for Class Certification in This Case Have Been Met.

Class certification is clearly warranted in this case, and federal courts have certified overdetention classes in several comparable circumstances.

### A.   The Proposed Class Meets the Requirements of Rule 23(a).

To warrant class certification, Movants must first demonstrate that they satisfy the requirements of Fed. R. Civ. P. 23(a) by showing that:

(a)   the class is so numerous that joinder of all members is impracticable;

(b)   there are questions of law or fact common to the class;

(c)   the claims or defenses of Movants are typical of the claims or defenses of the class; and

(d)   Movants will fairly and adequately protect the interests of the class.

### 1.   Numerosity.

To meet the numerosity requirement, the class must be so large "that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Although "there is no magic number needed to establish numerosity" (*Levitan v. McCoy*, 2003 WL 1720047, at *3 (N.D.Ill. Mar. 31, 2003)), the federal courts have long presumed that a class composed of 40 or more individuals would satisfy the numerosity requirement.  *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2nd Cir. 1993); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986); *Swanson v. Am. Consumer Indus., Inc*. 415 F.2d 1326, 1333 & n.9 (7th Cir. 1969) (151 is "[c]ertainly . . . a sufficient number to permit a class suit to proceed"; even 40 "is a sufficiently large group to satisfy Rule 23(a)").

As set forth above, Movants' review of just four months of LMDC records showed that out of 8,437 releases occurring during those periods:

- 27 took more than a day after receipt of the court order, with many being several days or even weeks;

- 342 took between 10 and 24 hours; and

- 3,066 took between 4 and 10 hours.[12]

Extrapolating those figures over the more than three-year period currently covered by the class yields:

- 243 took more than a day after receipt of the court order;

- 6156 took between 10 and 24 hours; and

- 55,188 took between 4 and 10 hours.

---

[12] Incredibly, Bolton testified that he thought only 16 or 17 people a year were overdetained at LMDC. *See DN 49, Ex. 3,* Bolton Dep., *at 76-78.* Clark, to whom the Records Department supervisors directly reported, thought the number was around ten. *See DN 49, Ex. 4, Clark Dep. At 63-64.*

Every hour a citizen is overdetained exposes them personally[13] to risks they would not encounter were they free -- lost wages, assault, infection, inattention to a serious medical condition.  But wherever the Court draws the line for a "reasonable" overdetention, it is obvious that the resulting class will clear the bar of numerosity.

Given the size of the class in this case, certification would also preserve the judicial economy arising from the avoidance of a multiplicity of actions, and would provide a consistent and cost-effective process for identifying and communicating with class members and resolving their claims for prospective injunctive relief. *See* 32B Am. Jur. *Federal Courts* §1608; 5 Moore's Fed. Practice -- Civil § 23.22[1][a] (3d ed. 2011).

## 2. Commonality.

Rule 23 (a)(2) requires the presence of "questions of law or fact common to the class." "Commonality requires [Movants] to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2556 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The class "claims must depend upon a common contention," and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*, at 2551. "A determination of commonality requires a precise understanding of the nature of the claims in the complaint: what conduct is alleged and how the allegations will be proved or disproved." McLaughlin, *supra*, §4:7.  In other words, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the

---

[13] This, of course, does not take into account the impact on dependents, or on public funds expended for the care of those overdetained,

proposed class are what have the potential to impede the generation of common answers." *Dukes, supra* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

In *Brown v. City of Detroit,* 2012 WL 4470433 (E.D. Mich. Sept. 27, 2012) the plaintiff sought certification of a class of individuals detained for 48 hours or more without a judicial finding of probable cause. The court found that the class definition satisfied Rule 23(a)'s commonality prerequisite, saying: "Here, the crucial question is whether [the defendant] had a 'clear and persistent pattern of violating federal rights.'" *Id.*, at *13-14 (quoting *Powers v. Hamilton Cty. Public Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007)).

In this case, certification is even more compelling than in *Brown* because of the record diligently developed by Movants in discovery.[14] Under the *Shorts* test, there are really just two questions in this case. The first, whether or not an individual was overdetained, can be determined with reasonable accuracy from a more extensive review of Defendants' records than that already performed by Movants. The second, whether such overdetention was the result of Defendants' deliberate indifference, has already been answered for the class as a whole. The chronic problems in LMDC's Records Department that have caused systemic overdetentions have already been well-documented, and Bolton, Clark and others have already admitted, on the record, that they've known about such problems for years. No effort has been undertaken by Defendants to determine the scope or nature of such overdetentions, much less to reduce them. Defendants' deliberate indifference is readily apparent.

---

[14] It is perhaps telling that, to date, Defendants have conducted no discovery in this case.

### 3.      Typicality.

Rule 23(a)(3) requires that the claims or defenses of Movant be typical of the claims or defenses of the class. "Typicality is met if the class members' claims are fairly encompassed by the named plaintiffs' claims.'" *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig*., 722 F.3d 838, 852 (6th Cir. 2013). In other words, typicality is "established where the claims of the class and the representative[s] arise from the same event or conduct and proceed on the same legal theory." McLaughlin, *supra*, § 4:16.

There is really no disputing the fact that Movants' claims are typical of those of the class. Movants were overdetained for periods of between 24 hours and six days.  There is no evidence in this case that Movants were singled out individually for their overdetention, which is really the only thing that could distinguish their claims from those of the class generally.

### 4.      Adequacy.

The Sixth Circuit has adopted a two-prong test for determining whether the adequacy-of-representation factor is met: "1) [T]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (alteration in original) (quoting *In re Am. Med. Sys., Inc*., 75 F.3d 1069, 1083 (6th Cir. 1996)).

There is no evidence of anything that distinguishes Movants' interests in this litigation from that of the class as a whole.  Movants share with the class the two goals of this litigation: first, to reduce or stop entirely overdetentions at LMDC; second, to compensate Movants and class members for their overdetention.

Movants have retained experienced and competent counsel who will fairly and adequately protect the interests of the proposed class. Plaintiffs are represented by James D. Ballinger, who is a competent and experienced litigator in complex civil matters, and Gregory A. Belzley, an inmates' rights lawyer who has litigated numerous complex federal civil rights class actions *See James D. Ballinger and Gregory A. Belzley Declarations attached hereto respectively as* **Exhibits N and O**.

**B.      The Proposed Class Meets the Requirements of Rule 23(b).**

In addition to satisfying the requirements of Rule 23(a), Movants must also satisfy at least one of the requirements of Rule 23(b).  The class proposed by Movants satisfies all three.

**1.      Declaratory and injunctive relief is appropriate because Defendants are acting or refusing to act on grounds that apply generally to the class.**

Movants seek injunctive and declaratory relief to reduce overdetentions at LMDC if not stop them entirely.  As already explained above, the systemic nature of the overdetentions and Defendants' continuing inaction demonstrate that they have "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful as to all of the class members or as to none of them." *Dukes*, 131 S.Ct. at 2557 (internal quotations omitted); see also *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972).

This feature of Rule 23(b)(2) certification makes it "uniquely suited to civil rights actions" like this one. *Connor B. v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011) (quoting *Yaffe*, *supra* at 1366). "[C]lass actions certified pursuant to Rule 23(b)(2) are particularly important in cases involving civil rights actions," as class certification in such cases is "crucial to ensure that the

granted relief benefits all members of the class." *Rolland v. Patrick*, 2008 WL 4104488, at *6 (D. Mass. Aug. 19, 2008) (citations omitted).

This case is also well-suited to class action treatment "due to the 'fluid composition' of the [jail] population." *Clarkson v. Coughlin*, 783 F. Supp. 789, 797 (S.D.N.Y. 1992) (quoting *Dean v. Coughlin*, 107 F.R.D. 331, 332 (S.D.N.Y. 1985)). Prisoners are released every day, yet the underlying claims remain. *Dean, supra* at 323-33; *see also Henderson v. Thomas*, 289 F.R.D. 506 (M.D. Ala. 2012) (certifying class of HIV-positive prisoners who alleged discrimination based on disability). While Movants are not *currently* experiencing an overdetention, this case involves precisely the type of class-wide misconduct that is "capable of repetition yet evades review," and that warrants examination even though Movants may no longer be personally at risk.  See *Sosna v. Iowa*, 419 U.S. 393, 402 n. 11 (1975); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911).

### 2.     The class' damages claims create a risk of varying adjudications and make a class action the superior method for fairly and efficiently resolving such claims.

Movants' proposed class also satisfies the requirements of Rule 23(b)(1) and (3).  A (b)(1) class is intended to avoid the "risk of inconsistent or varying adjudications" that could unduly complicate a fair and just resolution of common issues.  To be certified as a (b)(3) class, Movants must show that the class' common issues predominate over the potential individualized questions and that proceeding as a class action is superior to other available methods.  Where, as here, the relief pursued by the class includes damages, the Court must make specific findings that the requirements of Rule 23(b)(3) are satisfied.

Permitting damage claims to be resolved piecemeal through hundreds, perhaps thousands of lawsuits brought by class members serves no one's interest.  The burden on the courts cannot

be overstated. Awards will vary depending upon the judge, the composition of the jury, the appearance of the plaintiff, the skill of the advocates, the jury instructions, etc. Disparate amounts awarded for the same period of overdetention will not be fair or just. Some claimants will get too much, others too little. The episodic and duplicative nature of such proceedings will unnecessarily exacerbate Defendants defense costs and delay closure for all parties concerned.

Certifying a class for recovery of damages offers the parties the opportunity to resolve such issues by negotiation or, failing that, by litigation of select test cases to define the parameters of recovery and class-wide relief.

**C.      Comparable Overdetention Classes Have Been Certified by the Federal Courts.**

What Movants are asking the Court to do is not novel, and does not require the Court to "reinvent the wheel" or "write on a clean slate." *Bynum v. District of Columbia,* 412 F.Supp.2d 73 (D.C. 2006) and *Barnes v. District of Columbia,* 793 F.Supp.2d 260 (D.C. 2011), describe years of overdetention class action litigation on issues of liability and damages which began in circumstances very similar to the case at bar, and continued after authorities failed to follow through on the terms of a settlement. The history of those cases provide a roadmap of not only the process and procedure by which this case might be resolved, but of remedial actions to address overdetentions. In *West v. Murphy*, 2015 U.S. Dist. LEXIS 22502 (D.Md. February 24, 2015), the court certified a class of inmates who were detained for more than 48 hours without presentment to a judicial officer.

For the convenience of the Court, Movants attach not only the docket sheets in all three cases (***Exhibits P, Q and R***), but the court's orders granting class certification (***Exhibits S, T and U***).

**WHEREFORE,** Movants respectfully request that the Court certify in this case a class composed of:

*All persons who, since February 3, 2016, were imprisoned, detained or incarcerated more than four hours after: (a) entry of an order directing their release; and/or (b) their satisfaction of their term of incarceration set by prior court order.*

Respectfully submitted,

/s/ James D. Ballinger
James D. Ballinger
jim@kentuckytrial.com
Ballinger Law, PLLC
3610 Lexington Road
Louisville, KY  40207
(502) 426-3215

Gregory A. Belzley
gbelzley@aol.com
Camille A. Bathurst
camillebathurst@aol.com
Aaron Bentley
abentley3B@gmail.com
Belzley, Bathurst & Bentley
P.O. Box 278
Prospect, Kentucky 40059
(502) 292-2452

*Counsel for Movants*

### CERTIFICATE OF SERVICE

I certify that, on May 1, 2019, I served the foregoing via CM/ECF, which will send all parties of record a notice of electronic filing.

/s/ James D. Ballinger
*Counsel for Plaintiffs*