```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION


 3
      JACOB HEALEY, et al.,          )
 4                                   )
                 Plaintiff,          )    Case No. 3:17-CV-71
 5                                   )
           VS.                       )
 6                                   )
      JEFFERSON COUNTY KENTUCKY      )
 7    LOUISVILLE METRO GOVERNMENT,   )
                                     )    November 29, 2023
 8               Defendant.          )    Louisville, KY

 9
                              *  *  *  *  *
10
                      TRANSCRIPT OF STATUS CONFERENCE
11             BEFORE HONORABLE REBECCA GRADY JENNINGS
                    UNITED STATES MAGISTRATE JUDGE
12
                              *  *  *  *  *
13
      APPEARANCES:
14
      For Plaintiff:          Gregory A. Belzley
15                            Garry Adams, Jr.
                              Laura E. Landenwish
16
      For Defendant:          John F. Carroll
17                            John T. McLandrich

18

19

20

21                       April Dowell, RMR, CRR
                         Official Court Reporter
22                        232 U.S. Courthouse
                         Louisville, KY 40202
23                          (502) 625-3778

24    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
25
```

1          (Begin proceedings in open court 2:36 p.m.)

2          THE COURT:  We are going on the record in

3     3:17-CV-71.  Can I have appearances?

4          MR. BELZLEY:  Your Honor, I'm Greg Belzley here

5     appearing for the plaintiffs.  And, Judge, this is the first

6     time we've seen you since the tragic passing of my friend and

7     cocounsel Jim Ballinger.  I'm accompanied by Garry Adams on my

8     right and Laura Landenwish on my left.

9          THE COURT:  Okay.  All right.  Thank you.

10          MR. MCLANDRICH:  John McLandrich, Your Honor.

11          MR. CARROLL:  John Carroll, Your Honor.

12          THE COURT:  All right.  So we're here today, I

13     think, to figure out next steps.  It looks like your time with

14     the magistrate judge appointed special counsel is over and

15     we're ready to proceed forward.  So we're here to schedule

16     whatever we need to schedule to move us to get this case

17     rolling, so let me know where we stand and where you would

18     like to go from here.

19          MR. BELZLEY:  Judge, if I might just summarize since

20     there -- I look backed before this hearing and I -- I was

21     reminded that we were last here in this case in March of 2022,

22     so it's coming up on the two year anniversary.  I prepared

23     just a brief summary just to bring you up to date, Judge,

24     because we've been doing a lot of work outside of really your

25     purview but for Special Masters' reports you've received from

1    Judge Gamble.

2         THE COURT:  Right.

3         MR. BELZLEY:  We filed this case back in February

4    2017.  Our discovery showed that the defendants have had an

5    over detention problem going back as far as 2012 until we

6    conducted a manual -- our own manual review of records that

7    they produced to us.  I don't think that any investigation had

8    been made into the scope or the extent of these over

9    detentions that we're talking about in this case.

10        The over detentions to our knowledge are continuing

11   to occur.  We did discovery.  We filed a motion for class

12   certification.  Your Honor certified the class and identified

13   two subclasses.  Subclass A was all persons from February 3,

14   2016, to present who were imprisoned at the LMDC for more than

15   four hours with satisfaction of their term of imprisonment set

16   per court order.

17        The other subclass, Subclass B, were persons

18   released upon a court order, payment of bond or something of

19   that nature, and that class ran from the same date, but you

20   gave the defendants a grace period of 12 hours; they had to

21   have been detained more than 12 hours.  The defendants appeal

22   ed your class certification ruling.  The Sixth Circuit denied

23   an appeal of that, came back to this court.

24        We found at that point that the defendants were

25   working with an expert.  The expert had received some

1    documents that we weren't aware of, we came to Your Honor.

2    You'll recall there were a couple of hearings.  And the main

3    takeaway from that was quite properly Your Honor said I don't

4    want this case to turn into a battle of experts as to who was

5    over detained, how long, and so on and so forth.

6          You identified and subsequently memorialized in an

7    order some very specific questions you wanted answered by an

8    authority to who both defendants and the plaintiffs could

9    agree.  We agreed that that would be the expert that was then

10   working with the defendants.  That was Dr. Cowan.

11         And those questions were the name and last known

12   contact information of the class members, the date and time

13   their sentence expired, or LMDC received a court release order

14   via email or other means or bond was paid; the date and time

15   the class member was actually released from custody; a

16   calculation of the time that elapsed between the arrival of

17   the duty to release and the actual release; and the

18   explanation, if any, was readily apparent on the face of the

19   available documentation for the delay.

20         Again, this was made a subject of a court order

21   entered by Your Honor at Docket Number 126.  And in that order

22   you -- you adopted data points on which the parties had

23   reached agreement as to what information Dr. Cowan would be

24   drawing from these documents.

25         Early on in that process -- you also appointed Judge

1    Gamble to supervise that process.  Now, early on in that

2    process, we said -- plaintiff said -- you know, "Wait.  We

3    have already reviewed in discovery and made as a part of our

4    motion for class certification the results of our review of a

5    sample of four months," and Your Honor may recall that.

6           "Can we expedite this process by instead of having

7    Dr. Cowan initially collect all of this information and we

8    await that -- the finish -- the conclusion of that, can we

9    expedite this by simply having Dr. Cowan look at the same four

10   months we looked at and opine on the reliability of that data,

11   where we got something wrong, where we were right," etcetera,

12   etcetera?

13          We tentatively reached an agreement on that; that

14   that's the first thing that Dr. Cowan would do.  Subsequently

15   we added two post-COVID months to Dr. Cowan's review because

16   due to the pandemic, the population of the jail was reduced,

17   and so you couldn't accurately extrapolate results pre-COVID

18   to post-COVID, so that needed to be taken into account.

19          Now, the process that followed for Dr. Cowan doing

20   that took a lot of time.  That was in large part result --

21   that was not the fault of Dr. Cowan, defendants' counsel.

22          It was large part the defendants trying to identify

23   what actually was the universe of documents that might bear on

24   these issues and get them in a format that Dr. Cowan could use

25   and get those to Dr. Cowan.

1          However, that's happened.  And midway through last

2     summer Dr. Cowan came out with his results.  In the four

3     pre-COVID months that we manually sampled and that Dr. Cowan

4     checked over, his results were this:  Persons whose sentences

5     had expired were over detained a total of 1,575 hours or

6     approximately 400 hours per month during that four-month

7     period.

8          And when I say over detained, I'm talking about

9     class members that clear either the 4 or the 12-hour bar.

10     Persons who were ordered released by a court or who had paid

11     their fine or a bond were over detained a total of 6,431 hours

12     or approximately 1,600 hours each of those four months.

13          We believe from that the parties can reasonably

14     extrapolate that pre-COVID there were approximately 2,000

15     hours of compensable over detentions per month at the

16     Louisville jail.  And that over the 59 pre-COVID months from

17     the class inception date of February 3, 2016, through December

18     31, 2020, which the parties tentatively agreed as the start

19     point for the Covid -- post-Covid class, there were

20     approximately 118,000 hours or approximately 13 and a half

21     years of over detentions at the LMDC.  Now, those were the

22     results of the pre-COVID class.

23          Post-COVID, the two months sampled by Dr. Cowan

24     indicated that persons whose sentences had expired were over

25     detained a total of 97 hours in that two-month period or

1    approximately 50 hours a month.  Persons who were ordered

2    released by a court or who had paid their fine or a bond were

3    over detained a total of 1,822 hours in that two-month period

4    or approximately 900 hours a month.

5         From that we believe it could be reasonably

6    extrapolated that post-Covid, there were approximately a

7    thousand hours of compensable over detentions per month at the

8    LMDC.  And that over the 32 post-COVID months that we've since

9    had, there were approximately 32 thousand hours or almost four

10   years of over detentions at the LMDC.  And of course we

11   believe that those over detentions are still continuing.

12        We do not believe at this point that there's a

13   significant dispute among the parties over the numbers I just

14   gave you.  It was always anticipated that there would be a

15   dispute as to what value should be assigned to every

16   over-detained hour, every over-detained minute.

17        To start that conversation, it was agreed among the

18   parties that the plaintiffs would first make a demand, which

19   we did in early September, then the defendants would have 45

20   days to consult among themselves and with their insureds and

21   their counsel and makes us a response.

22        We knew that the defendants would likely be alarmed

23   at the result of the over detentions that have occurred when

24   applied to compensable figures, but -- although the defendants

25   have indicated that they're willing to mediate, they have not

1     made us an offer.

2         And it was our understanding that we were going to

3     get some offer of some money and that at least we would cross

4     that threshold at least to the extent that there is some

5     understanding that these over detentions are and should be

6     compensable. We're not at that point. And before we

7     undertake a mediation of a case of this size, importance, and

8     complexity -- and Your Honor with your class action experience

9     knows just how complex that can get -- we have to clear at

10     least that hurdle.

11         So without having that hurdle cleared, we've really

12     got no choice and had no choice but to come back and ask the

13     court to put the case back into active litigation. When we

14     got the response, we gave -- we told the defendants we need a

15     counteroffer of some kind, gave them ten days, we got nothing,

16     and that's when we filed our motion.

17         THE COURT: All right. And what are you proposing

18     would be the next steps for the court to take?

19         MR. BELZLEY: Well, honestly, Your Honor, I don't

20     think that there is any outstanding issues other than the

21     following: Number one, what's the value of an over-detained

22     period of time; whether that be a minute, whether that be an

23     hour. And that can be resolved with a jury trial in which the

24     cases of one or more class members are considered or it can be

25     accomplished in the -- in the trial of a number of test cases

1    individually.  We would be interested in the court's feelings

2    about that.

3            Now, once that value is determined by a jury or

4    juries, then I think the administration of a class resolution

5    becomes an issue as to which class members receive direct

6    payments, which class members have to submit a proof of claim.

7            Now, Dr. Cowan is now in the process -- it's our

8    understanding -- of satisfying this court's directive as to

9    what information he's to compile.  And so at some point,

10   Dr. Cowan is going to be able to present to the parties and

11   this court a database that answers all the questions the court

12   asked of him; and that's who got over detained, for how long,

13   and so on.

14           Now, we know from the work he's done on the samples

15   that approximately -- there were approximately 300 people in

16   that six-month period that -- and I think I'm correct about

17   that -- approximately 300 people in that period where he

18   couldn't make a determination whether they were over detained

19   or not.

20           THE COURT:  Why?

21           MR. BELZLEY:  As to everybody else he could

22   determine whether they had been over detained, to the extent

23   that qualified them as a class member, or whether they

24   weren't.

25           THE COURT:  Why couldn't he make that determination?

1        MR. BELZLEY:  I'm sorry?

2        THE COURT:  Why couldn't he make that determination?

3        MR. BELZLEY:  Lack of documentation and just the

4   ambiguity of the documentation.  It's the position of the

5   plaintiffs that once we reach that point as to the over

6   detentions that Dr. Cowan has clearly identified, there are

7   going to be direct payments made to those class members.

8        A proof of claim process is necessary only for those

9   limited individuals for whom a determination can't be made

10  whether there were over detained or not.  Then after that,

11  Your Honor, question as to how payments are to be made, what

12  is to be done with un -- unclaimed or unpaid compensation that

13  comes back.

14       We have proposed in our -- our demand that that

15  money go to -- back to the county and the city and the jail

16  for its use in fixing this problem.  And that -- it's going to

17  cost a lot of money to fix this problem and that would be a

18  significant source of monies in order to start that job, but

19  we would like the problem fixed.  We certainly don't want to

20  come back here with another lawsuit when it isn't.

21       THE COURT:  Well, then there was a request, I

22  believe -- I haven't looked at the papers in quite a while,

23  but I believe there was a request for an injunction --

24       MR. BELZLEY:  That's correct.

25       THE COURT:  -- as part of this.

1              MR. BELZLEY:  That's right.

2              THE COURT:  Because if the argument is that the over

3      detentions are still occurring, this is a never ending --

4      never ending position.  So I'd like to think a little bit as

5      well about where that injunction lies and what is part of that

6      injunction; how does that get fixed.

7              I believe part of the reason we certified the

8      classes in the manner we did was there was some argument over

9      what was a reasonable period of time to be over detained.

10     What -- obviously, I get the paper.  What happens next?  It

11     takes how long to assure that there's not a warrant, go

12     through the motions of what needs to be done.  Has that issue

13     been resolved by the parties at this point?

14             MR. BELZLEY:  No, Your Honor.  We have done all of

15     this work based on the --

16             THE COURT:  The four hours.

17             MR. BELZLEY:  -- the definitions of the class.

18             THE COURT:  Okay.  And I think the four hours was

19     part of the discussion with defense counsel about what was a

20     reasonable period of time after you receive that document to

21     get them out the door.

22             MR. BELZLEY:  Correct.

23             THE COURT:  Okay.  All right.  From defense?

24             MR. MCLANDRICH:  So, Your Honor, there's -- there's

25     a number of issues that remain, I think, outside of what

1    plaintiff has indicated.  So just with respect to the data

2    itself, Dr. Cowan has not completed an analysis of the data.

3    What plaintiff has indicated is correct in the sense that when

4    Dr. Cowan completed the analysis of the sample data, plaintiff

5    made a demand.

6          And as he also indicated, the sample data ended up

7    being there four months plus two more months, so that's six

8    months out of the class period which is just that; a slice of

9    the class period.  So there's a substantial body of people for

10   which we do not have the data yet.

11         We've been in discussion with Dr. Cowan and are

12   still awaiting from him an estimate as to how long it would

13   take and how much it would cost and what the best process

14   would be to harvest that data for the remaining class people.

15         And so where it gets particularly complicated is

16   with respect to the people who were not in the sentenced class

17   but who were in the pretrial-detainee, if you will, class.  So

18   for people that are sentenced, it's somewhat more

19   straightforward in the sense that you have the beginning of

20   the sentence, the end of the sentence, and then when they're

21   actually out the door.

22         For the people who were pretrial detainee, you have

23   when they get out the door, but on the front end it's more

24   complicated because these orders were coming over to the LMDC

25   in a variety of fashions.  They were coming by email starting

1    in about September of 2017.  The class goes back into 2016

2    when they were obviously not doing that.  They were coming

3    over by fax or coming over hardcopy.

4            Even where they're coming over email, the

5    challenge -- and this is why it took so long with respect to

6    the sample months -- it becomes a matter of opening all those

7    emails, extracting all the orders that are attachments to all

8    those emails, matching them up to the inmates, and then

9    figuring out what it's telling us about what time the order

10   arrived at LMDC to start the duty to release and then

11   ultimately tracking it to the actual release time, so that

12   still has to be done for all those potential class members.

13           THE COURT:  Like, how many people are we talking

14   about here?

15           MR. MCLANDRICH:  So there's roughly a hundred and --

16   I think it's 127 thousand people that we're processed, if you

17   will, and --

18           THE COURT:  How many people in the six-month period

19   were over detained, like, people not hours; people?

20           MR. MCLANDRICH:  I could look it up.  I don't

21   remember off the top of my head.  I think that the

22   projection --

23           MR. CARROLL:  The projection was for pre-pandemic is

24   2. -- is 3.4 percent.  The projection for pandemic and

25   afterwards is 2.6 percent.  The actual number of inmates

1    anymore -- at one time they used to have a much greater number

2    of inmates at LMDC.  That number has gone down substantially.

3    There's, of course, a number of people now that are now in

4    home incarceration instead of things, so the numbers actually

5    have gone down for a period of time compared to what they were

6    originally, but we're still dealing -- you know, it's quite a

7    number.

8            And then you have -- you know, for example, you have

9    individual files -- if there are questions with people, there

10   are individual files on everyone of these people.  They

11   literally -- and, of course, that's in paper form.

12           THE COURT:  And are we just -- okay.

13           MR. MCLANDRICH:  I'm sorry, Your Honor.  To answer

14   your specific question, in the sample -- in the pre-COVID

15   sample, there was -- of the people in the sample, so there

16   were 10,730 people in the pre-COVID period that were reviewed.

17           6,800 were not over detained.  3,300 were excluded

18   because they were in home incarceration or AWOL or something.

19   There were 241 that he could not determine their status.

20   There were 339 that were over detained.

21           THE COURT:  Okay.

22           MR. MCLANDRICH:  And so it's a small percentage of

23   folks that are actually over detained, but one has to call

24   through them all to ascertain who's who.  And so we do not

25   have a list of all the people who were over detained that

1    could be, for instance, noticed, but beyond that, there's

2    other issues that need to be addressed before this case is

3    like, you know, ready for trial.

4        There were individual defendants in the complaint --

5    the allegations in the complaint that there's this systemic

6    failure over at LMDC that resulted in over detention.  So the

7    only discovery that was done was discovery that was with

8    respect to their motion to certify the class.

9        So we would need discovery with respect to the

10   class, we would need discovery with respect to liability

11   issues, we need dispositive motion practice with respect to

12   the merits of the claims, and then, of course, Dr. Cowan needs

13   to complete this remaining analysis.

14       The court found these 4 and 12-hour periods of time

15   for purposes of class certification, you know, that -- and the

16   order has language to this effect in your certification order.

17   That wasn't found as a liability standard.  That was found

18   with respect to certification.  So with respect to whether

19   that, in fact, represents a liability standard or not remains

20   to be seen.

21       So there's a variety of issues.  We're happy to

22   mediate the case.  I get the plaintiffs, you know, position,

23   if you will, that nobody's offered us any money, so we don't

24   want to mediate the case.  It's -- you know, it's sort of

25   simpler, if you will, to make a demand then it is to make the

1    offer in these circumstances.  And let me sort of explain what

2    I mean by that.

3          So -- and we may have talked about this some the

4    last time I was here.  I was hired by one of the excess

5    carriers.  There's two excess carriers.  Legit is the first

6    layer of financial responsibility for any judgment that might

7    result.  Legit has -- as I understand it -- and, John, correct

8    me if I get it wrong -- two and a half -- the first layer's

9    like $500,000.  It's their own money.  Then they have their

10   self-insurance pool that I believe's like two and a half

11   million dollars.

12         Most of that money has all been exhausted.  After

13   the demand came in, Legit voted to extend their remaining

14   authority towards the settlement.  That's a fairly minimal

15   amount of remaining money given the cost of the work that

16   Dr. Cowan has done.

17         At that point, you know, the excess carriers have

18   gotten involved.  They both have coverage counsel.  Louisville

19   Metro has retained coverage counsel who are working through

20   their issues with respect to what excess insurance there

21   actually is.

22         Once that excess insurance piece is hammered out, if

23   in fact it comes to agreement which I think is unknown, then

24   the funding source becomes the Louisville Regional Metro

25   Government itself which requires councilmanic -- I would

1    think -- action -- I'm from Ohio, so forgive me -- but

2    councilmanic action.

3            So the idea of, you know, "Make us an offer"

4    presumes that we have, like, ready money in our pocket that

5    we're authorized to expend.  So it's not an unwillingness to

6    negotiate or some effort to stonewall the plaintiff or however

7    one wants to characterize it.  It's just not a simple matter

8    where we can walk across the hall to someone and say, "Give us

9    a hundred million dollars or twenty million dollars or ten

10   million dollars," so we can make this offer that the

11   plaintiffs would like us to make.

12           THE COURT:  All right.  So I'm somewhat less

13   concerned with the mediation and the offers and the settlement

14   issues because that's going to go to a magistrate judge.  That

15   is not going to lie here in this court.

16           What I'm a little more concerned about right now is

17   getting to the bottom of the issue itself.  If people are

18   being over detained at LMDC, 3 percent -- whatever it is --

19   there's still a reason for that somewhere, correct?

20           MR. MCLANDRICH:  And --

21           MR. CARROLL:  And.

22           THE COURT:  And we have to get to the bottom of that

23   as part of the discovery process, I presume, has to be part of

24   the step in that direction.  Now, the compensation for the

25   people who have already been over detained, that's sort of a

1    separate issue from is there a policy and procedure that is

2    not working.

3         I mean, when we read the original documents in this

4    case, we're talking about things like printing out emails,

5    putting them in a dish, and then going from top to bottom.  I

6    mean, we're talking about what I would perceive to be

7    illogical way of addressing releases.

8         If those issues are taking place, we need to get to

9    the bottom of that piece of it, right, 'cause that's the piece

10   going forward that has to be dealt with and that is where the

11   liability lies, right?

12        If the people who are already in the class -- the

13   class has been certified, the Sixth Circuit has already

14   reviewed my order, that piece of it is done, so now I think

15   the issue is discovery for the merits of the case.

16        Whether or not you-all mediate or go talk to another

17   magistrate judge, obviously the Special Master that I

18   appointed, Judge Gamble, not -- you know, it would be someone

19   else who would sort of take over that piece of it, but

20   regardless, there's still the piece about whether the system

21   isn't working.

22        So I think we need to go ahead and set some sort of

23   discovery parameters.  And, again, I'm probably going to send

24   you to magistrate judge for that too because it may need a

25   little hand holding to figure out what we actually need.  What

```
 1    I don't want to do is burden everyone with over discovery,

 2    right, 'cause there's a tendency for that to happen when we

 3    get into these big things.

 4          We need to focus the discovery on what needs to be

 5    found out specifically for the over detention process and

 6    procedure issues.  That's what needs to be fixed.  I mean, at

 7    the end of the day that's the ultimate goal of the litigation

 8    is to fix that issue if it exists and if it can be fixed.

 9          So I'd like to set some discovery parameters.  I'd

10    like to sort of take a step back, let's get the discovery on

11    the merits taken care of in a timely fashion.  I can't imagine

12    that piece of it taking nearly as long as the class piece.

13          And then moving forward, getting some dates on the

14    calendar so that we're not just waiting for one another to

15    give offers about things.  So is there an understanding of

16    what discovery is needed on the merits?

17          MR. BELZLEY:  Well, Your Honor before we filed our

18    motion for class certification, we undertook considerable

19    discovery on the merits --

20          THE COURT:  Yes.

21          MR. BELZLEY:  -- and have deposed all of the

22    defendants.  We think we got a handle on what the -- what the

23    myriad of problems are --

24          THE COURT:  Well, he's saying he needs discovery, so

25    I'm less concerned -- no offense.  I'm less concerned about
```

1    what you need right now.  He's the one saying he needs

2    discovery, so what is it that -- what's the scope?

3           MR. MCLANDRICH:  Yeah.  So several things in that

4    regard, Your Honor.  We need depositions of the named

5    plaintiffs for one thing, but the reality is, while they took

6    depositions, what's being done at LMDC today is not what was

7    being done at the time they took those depositions.  There's

8    new administration, new people in place, new systems in place.

9           I'm not completely conversant with it, but it's my

10   understanding they've been going through the process of buying

11   and implementing a new computer system.  And so, you know,

12   obviously they're aware of the litigation.  They're trying to

13   get their act together.

14          THE COURT:  Right.  At some point the date is going

15   to cut off, right, at some point the world of over detentions

16   for this period is going to end because the process is

17   different.

18          Now, I'm confident all through that period, there

19   are going to be tweaks and changes to the process because no

20   process is ever completely stagnant, I understand that, but

21   when we implement a new computer system or whatever it is --

22   I'm going to assume it's some form of technology -- there's

23   going to be a cutoff date to this litigation and then somebody

24   wants to take it up on the next piece of technology, you know,

25   that's not for this.

1         But for this period of time, you want depositions of

2    the named plaintiffs.  I assume there are some people that

3    have -- I know there were some people already deposed about

4    the process.  Are there more pieces of information you believe

5    you need on that front?

6         MR. MCLANDRICH:  You know, probably not in the sense

7    that the other people obviously operating the system are our

8    clients, so we don't need to depose them.  We can get

9    affidavits from them to the extent that's necessary.

10        You know, one of the -- one of the issues that may

11   come up is -- so there may be expert testimony on those

12   issues.  I'm not sure there necessarily will be with respect

13   to the issues of the system itself.  So no system is ever

14   perfect, right?  And there's technology and there's -- and

15   then there's individuals that run it.

16        And you might or might not recall when we were here

17   last time -- and these are some of the deficiencies that the

18   plaintiffs had noted that are outside of the control of LMDC.

19   Some of these issues were the issues with the court and

20   interfacing with the court and the way the court was

21   generating and transmitting orders that are outside of our

22   control.

23        And, frankly, one of the issues we struggle with and

24   I think they're still struggling with over there is from a

25   staffing standpoint, this is now unionized workforce, and so

1   LMDC's hands -- to some degree in Louisville Metro -- hands

2   are tied with respect to being able to just implement changes

3   to the workforce because of their strictures with their union

4   employees.

5           So as an example just to, you know, crystalize it,

6   if you will.  One of the issues was turnover and under

7   staffing.  So with respect to those things, that is driven in

8   part by wage rates.  They want to pay these people more in the

9   records division to get better quality people and a longer

10  retention.

11          The union took the position -- and apparently still

12  does as far as I know -- that you can't just pay the records

13  people more.  They're part of a larger bargaining unit.  You

14  got to pay everybody in that bargaining unit more, you just

15  can't pay records more, so -- you know, and I understand at

16  some point the court rightly kind of doesn't care, but --

17          THE COURT:  It's far afield of the actual issue.

18          MR. CARROLL:  And then you also have another

19  problem, Judge --

20          MR. MCLANDRICH:  Well, it's not in the sense that

21  these are the people processing these releases.

22          THE COURT:  So -- okay.  But for a merits-based

23  answer to the question, is the policy and procedure causing

24  unconstitutional over detentions?

25          MR. MCLANDRICH:  Well, it's not just policy and

1    procedure, right, it's practice, policy and procedure.  So

2    it's the -- the procedure and practice can be fine.  It's --

3    there's humans that have to ultimately implement it.

4              THE COURT:  I understand -- at some point, right --

5              MR. MCLANDRICH:  At some point no one cares, I get

6    it.

7              THE COURT:  Well, no, not that no one cares because

8    I'm sure the people who were over detained probably care and

9    I'm also sure that the workers who were over worked, they

10   probably care too.  But at the end of the day, we've thrown up

11   in this case a ton of roadblocks about moving it forward and

12   they were legitimate roadblocks and we've worked through a

13   Special Master to get through them and it took some time.

14             But what we need to know now is -- I understand that

15   there are problems to getting this process in a great

16   position, but what are the problems to getting us to a point

17   where you all can file dispositive motions?  That's what we

18   need to figure out now.

19             'Cause the next stage here is -- they took a ton of

20   discovery because one of the reasons we were able to issue a

21   pretty detailed class cert order was because there was a lot

22   of discovery already done --

23             MR. MCLANDRICH:  Yeah.

24             THE COURT:  -- and it -- you know, the class cert

25   had a lot of the merits kind of intertwined in it and -- it

1   was inextricably intertwined.  But what do we need now for me

2   to set a dispositive motion deadline?

3          MR. MCLANDRICH:  Yeah.  You know, again, I think

4   from our standpoint, we need to depose the named plaintiffs

5   and then I think we can file our motion.

6          THE COURT:  Okay.  How long do we think that will

7   take?

8          MR. MCLANDRICH:  Oh, I would say, you know, just

9   with the scheduling, a couple months.

10         THE COURT:  Okay.

11         MR. MCLANDRICH:  Probably three months, four months.

12         MR. CARROLL:  And in this respect, Judge, and

13  obviously it's another case, but I start a class action trial

14  on December 12th, for example, that's going to last probably

15  ten days if it goes.  It should go.  You know, some of the

16  dispositive motions are still out there, so -- you know,

17  again, we have to give some time that I can -- you know, I'm

18  the primary one here doing the work from Metro's standpoint.

19         THE COURT:  Yeah.  I understand.  So here's what I'm

20  going to propose.  How about we go out to -- well, tell me

21  this.  After you get your depositions done, how long do you

22  want to file your dispositives?

23         MR. MCLANDRICH:  I would say, you know, probably 30

24  to 45 days thereafter, but just recognizing, though -- but

25  aside from that sort of merits piece, right, and before the

1   case can be ready for trial, we have to discover whether

2   damage allegations are in fact uniform.

3          Because they talk about, you know, we can have sort

4   of like a bellwether trial and apply that damage uniformly

5   across the class.  We don't know that that's at all true

6   without doing discovery of the class members, right?

7          THE COURT:  Okay.  You have the named class members.

8          MR. MCLANDRICH:  We have the named class members --

9          THE COURT:  It's been certified as a class, so to

10  some extent there is going to be some general uniformity of

11  damages, but it's coming up with what would be the factor that

12  you're using to apply to the over detention.

13         Now, I'm sure one person's over detention is going

14  to cause them to lose their job potentially where another

15  person's over detention might not be anything more than just

16  sitting in jail, and I understand there are differences there,

17  but in a class action, it does get smoothed over a little bit,

18  so I'm not sure if you're asking for discovery of each and

19  every class member or --

20         MR. MCLANDRICH:  Well, so here's the point, I guess,

21  I'm making.

22         THE COURT:  Okay.

23         MR. MCLANDRICH:  So as I'm sure the court's aware

24  and as the law would reflect, the class can be certified

25  because there's common issues with respect to liability even

1    where the damage issues aren't, in fact, uniform and separate

2    damage hearings have to be made.

3         Our dialogue with the plaintiff to date has been and

4    perhaps they'll continue to say, I don't know, that we're not

5    claiming individualized damages for these people.  We're not

6    saying that one person's different from the other.  We're not

7    saying they lost their job or anything else.  We're just

8    talking about the mere fact that they were there longer than

9    they should have been.

10        If that's the path we continue down, then it is a

11   very different reality, but as the court's probably also

12   aware, you know, the Supreme Court has said that there is no

13   value for the perceived value of a constitutional right.  It's

14   compensation for loss, right?  So now what's this trial going

15   to be?

16        It's not going to be -- you know, with all due

17   respect to the constitution and the court and all the rest of

18   it, "Oh, my God my due process rights were violated.  I was in

19   jail too long."  It's going to be what's the value of that too

20   long.  And if the value of that too long is not measured by,

21   as you're saying, "I lost my job," "I missed my doctor's

22   appointment," "my father died," what have you, which are

23   individualized inquiries, it's going to be simply, "I was in

24   here an hour too long," "I was in here five hours too long,"

25   "I was in here ten hours too long," then that's a very

1    different world.

2          And at some point -- and the case law supports

3    this -- there's a level where that over detention is de

4    minimis and we may disagree on where that point is.  Someone

5    who's in there five minutes too long may not be entitled to

6    any compensation at all or it may be a very nominal

7    compensation.

8          And so people without actual loss, as the law also

9    supports, are entitled to a nominal damage for their

10   constitutional violation.  So, you know, currently we have a

11   hundred million dollar demand which represents $580 some

12   dollars per hour for every hour somebody was over detained.

13         Now, there's no underpinning to that other than "We

14   want it."  And so we're faced with a situation where this

15   damage is untethered to anything other than someone's desire

16   to be paid.

17         THE COURT:  Okay.

18         MR. MCLANDRICH:  That's my problem.

19         THE COURT:  And there is nothing that says that the

20   court cannot adjust the classes for purposes of damages.  The

21   certification -- and that -- we're not at that bridge yet, I

22   don't believe.  The class was certified for the purpose of

23   getting to the merits and those merits were divided into two

24   subclasses dependant on the types of orders we were talking

25   about and the type of detention; whether it was pretrial or

1    whether it was actual sentence.

2         So I'm happy to revisit that issue about whether or

3    not these two classes are the correct classes for damages, but

4    they've got to be the right classes for at least getting to a

5    merits-based question that we need dispositive motions on.

6         And once we clear that hurdle, then we can get

7    there.  And presumably if you need discovery on that, we

8    can -- I mean, it can be gotten, right, but you've got the

9    class reps right now to start down that road.

10        MR. MCLANDRICH:  A hundred percent, Your Honor.  And

11   I agree with what you're saying.  I just wanted to make clear

12   that, you know, when people talk about the merits, there's

13   liability and there's damages and I just didn't want to gloss

14   over that issue.

15        THE COURT:  I understand.  Let's start with the

16   merits first.

17        MR. MCLANDRICH:  Yeah.

18        THE COURT:  Let's start with the actual liability

19   piece.  Let's get that down the road, 'cause we're spinning

20   our wheels unless we get that down the road.

21        MR. CARROLL:  And again, Judge, when they made their

22   demand, they said to us, "I want ten days" -- "In ten days I

23   want you to give a number back to us," which quite frankly

24   wasn't -- it's just not workable and that's not the way any

25   case is ever done, so we're not saying we don't want to

1    mediate.  We do want to mediate.

2           THE COURT:  Okay.  And mediate you can with a

3    magistrate judge, not with me, so -- and that's how it's going

4    to be.  I am here -- look, I've litigated class actions in my

5    career, so I understand that once we get to a certain critical

6    mass of information, you're going to have to go mediate

7    because it doesn't make sense not to.

8           Nobody goes past a certain point in a class action

9    without going to a mediation.  We all know that.  Everybody in

10   this room knows that.  Even the criminal lawyer sitting in the

11   back, they probably know that too.

12          So what we need to do is if you want X number of

13   months to get the discovery done, I'm going to give it to you.

14   Then we're going to take X number of months to get the

15   dispositive motions in, we'll get those back to you, but I

16   want a structure to move forward because eventually I'm

17   probably going to have to give you a trial date to force you

18   all to go to mediation.  That's how this is going to work at

19   the end of the day.

20          So let's go ahead and get some dates on the calendar

21   that you all believe you can meet.  We've got holidays in

22   here.  There are trials in here.  I would say right now you're

23   not -- you're going to plan these depositions over the next 30

24   days, you're going to plan them, and you're probably not going

25   to be executing them until sometime in the new year, so I

1    would suggest we give you a date somewhere around March 1st to

2    have your discovery complete.  Does that sound reasonable?

3          MR. BELZLEY:  It does for the plaintiffs, Your

4    Honor.  We're done now, basically.

5          THE COURT:  Oh, you'll come up with more stuff.

6          MR. BELZLEY:  I don't know.

7          MR. ADAMS:  We will.

8          MR. BELZLEY:  And if I could just speak to the point

9    I think, Your Honor, is getting at is kind of at what point do

10   we say the problem's been fixed and looking back how do we

11   handle the damages issue?

12         THE COURT:  I'm hoping in discovery you all figure

13   out when the implementation date is and I would presume this

14   is something you all could come to agreement on; is when the

15   date is that a new system is in place.  And then you all can

16   go criticize the new system, but that won't be for this

17   lawsuit.

18         MR. BELZLEY:  Right.

19         MR. MCLANDRICH:  I think one issue with respect to,

20   one, is the system fixed, right, is what's the standard for

21   being fixed.  If the standard is no one is ever over detained

22   again, then I don't think we ever get there, right?

23         THE COURT:  Well, that's why we have the liability

24   portion of the case, right?

25         MR. MCLANDRICH:  Right.  What -- what's that

1    standard; is it one percent, half a percent?  You know, that I

2    think sort of begs the question.  I mean, quite frankly -- and

3    I get the court's position, got to move the case, there's a

4    substantial part of me that says none of those dates should be

5    necessary, right?  We ought to just get it resolved, but I

6    understand that hasn't been resolved, so the court has to move

7    the file.  I a hundred percent get that.

8            If we could get April 1st, that might be a better

9    date for us, but the court's going to set whatever date it

10   feels is appropriate.

11           THE COURT:  Well, I'm talking about getting your

12   discovery done.

13           MR. MCLANDRICH:  As am I.  Yeah.

14           THE COURT:  You want to -- how many -- how many

15   named plaintiffs were there?

16           MR. MCLANDRICH:  There's only like four or

17   something.

18           MR. CARROLL:  Five.

19           MR. BELZLEY:  At this point I think there's only

20   about four of them, Your Honor.

21           MR. MCLANDRICH:  Yeah.  So either way.

22           THE COURT:  I feel like we can get four depositions

23   and whatever else you want done by March 1st.  Then I'm going

24   to give you until May 1st to file -- that's 60 days -- to

25   file --

1          MR. MCLANDRICH:  That's fine.

2          THE COURT:  -- dispositive motions.  You'll have the

3    standard reply time.  If I'm remembering your last briefing,

4    are you going to be asking to extend the page limits?

5          MR. MCLANDRICH:  I wouldn't imagine so.

6          THE COURT:  Okay.  I like that answer.  Excellent

7    answer.

8          MR. BELZLEY:  I don't think so either, Your Honor.

9          THE COURT:  Okay.  So we'll give you to May 1st to

10   file those dispositive motions.  We're going to get a ruling

11   to you out over the summer, and then at that point in time, we

12   can go forward with anything else that we need as far as

13   setting deadlines, but I'm going to set a status conference so

14   that we can come back here and get whatever further dates we

15   need.

16          In the meantime, I'm going to set this as an initial

17   discovery schedule, but I'm also going to refer the case to

18   the magistrate judge here and I'm going to ask that you file a

19   joint status report every 30 days to see where you are and

20   make sure we're still on track.  And then if you need

21   additional dates or you feel like there is damages discovery

22   or something else out there that hasn't been considered, we

23   can get the magistrate judge on that, okay?

24          It's also going to be referred for mediation

25   purposes.  So if you happen to come to a point where you-all

1    agree it's time -- doesn't seem like right this minute you all

2    feel it's time.  Maybe half of you do, half of you don't.  So

3    once you get to the point where that is what you're ready for,

4    it will already be referred to the magistrate judge, okay?  So

5    let's try for a status around the beginning of -- so somewhere

6    in August.

7              THE CLERK:  August 24 -- 21st, 2024.  1:30.

8              MR. BELZLEY:  That's good on my calendar, Your

9    Honor.

10             THE COURT:  Can we put it on the 20th?  Let's put it

11   there after the last one.

12             THE CLERK:  That would be August 20th at 3:00.

13             MR. MCLANDRICH:  I have a trial that's scheduled to

14   start on the 19th.  You know, I mean, we can put it on that

15   date.  If the trial doesn't go, fine.  If it goes --

16             THE COURT:  Okay.  Let us know if it goes.  We'll

17   put it -- because everybody's going to get trials between now

18   and then.

19             MR. MCLANDRICH:  Right.  I understand.

20             THE COURT:  I may even get some too, so it may not

21   work out, but I'm going to put it on there because it's a

22   backstop.  It tells us all we need to come back and reconsider

23   this so it doesn't get lost in the case files that are sitting

24   on our shelf.

25             I just feel like we need a backstop to keep it

1  moving now that I don't have my Special Master riding herd

2  over the case, so I think this will help us just move forward.

3  It will get our magistrate judge kind of in the loop on, you

4  know, the schedule that we've set.  And if there are discovery

5  issues going forward, you know, the magistrate judge here can

6  handle that.  Who's assigned to the case?

7          THE CLERK:  Magistrate Judge Edward.

8          THE COURT:  Okay.  Judge Edward is on this case

9  already.

10          MR. MCLANDRICH:  Just from a clarity standpoint,

11  does that mean the referral to Magistrate Gamble is

12  terminated, Your Honor?

13          THE COURT:  He was completely a Special Master.  If

14  you wish to go back to him, you are more than welcome to go,

15  but the court has -- has terminated -- to the extent he did

16  what he was supposed to do and he filed a final report to the

17  court, he's off the hook, but you all are welcome to engage

18  him and I'm sure he would be happy to see you.

19          MR. MCLANDRICH:  I just want to know what the extent

20  of my obligations are.  Thank you, Your Honor.

21          THE COURT:  No.  The magistrate judge here will take

22  over all of those things.  The Special Master's job, I think,

23  has come to its logical conclusion and he did file a final

24  report with us, so essentially his appointment is over, but

25  you are welcome as private attorneys to go chat with him any

1    time you wish.

2           MR. MCLANDRICH:  Sure.  Thank you, Your Honor.

3           THE COURT:  All right.  Anything else we need today?

4           MR. BELZLEY:  No, Your Honor, not from the

5    plaintiffs.

6           MR. MCLANDRICH:  No thank you, Your Honor.

7           THE COURT:  Okay.  All right.  Well, we'll see you

8    back here in August.

9    (Proceedings concluded at 3:27 p.m.)

10

11                    C E R T I F I C A T E

12      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

13   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15
          s/April R. Dowell                December 1, 2023
16   Official Court Reporter, RMR, CRR          Date

17

18

19

20

21

22

23

24

25